Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable United States Court of Appeals of the Fourth Circuit are admonished to give their attention for the court is now sitting. God save the United States and this Honorable Court. Good morning. Mr. Hughes, you may proceed. Thank you. Good morning, and may it please the court, Paul Hughes v. Petitioner Portillo-Flores. This case concerns fundamental principles of administrative law. When adjudicating a case, the agency must apply the correct legal standards, it must apply sufficient, cogent reasons for its conclusions, and it must issue a decision demonstrating that it has discharged its duty to consider the relevant evidence. When the agency fails in any of these essential tasks, a court may not affirm by doing the work of the agency itself. Here, the agency failed at every turn. In assessing whether Portillo's abuse reached the level of persecution, the agency applied an erroneous legal standard. It held that repeated instances of violence qualifies persecution only if an individual requires medical care. The Third Circuit recently rejected this standard, and this court should as well. Other than that legal misstatement, the agency failed to provide any articulable reasons for arriving at its conclusions. As to government control, the agency again failed to apply the correct standard. It did not address whether Portillo's failure to request police assistance was justified because doing so was either futile or would put him at risk. And the record was filled with evidence satisfying this standard. Counsel, on the issue you just raised about whether Mr. Portillo Flores' report would have put him at risk, was that issue addressed in the brief to the Board of Immigration Appeal? Yes, Your Honor. The issue was preserved in both the Notice of Appeal and in the brief to the BIA. Can you please point to the JA sites, please? Yes, Your Honor. I'll start with the Notice of Appeal, which is of JA 47. And this court in Luzama said that the Notice of Appeal is the important place to begin for preservation to the BIA because the brief itself is in fact optional and is not required to be filed. And at JA 47, Mr. Portillo appealed the decision on past persecution. The issue here as to government control is a subcomponent of past persecution. You know that because in the ALJ's decision at pages 80 to 81, it was decided under the heading of past persecution. And of course that's correct because the governing regulation at stake here, 8 CFR 1208.13 G1, says that government control is a component of the past persecution analysis. Your Honor, if we move forward to the BIA brief itself, which again is not required for preservation, but it was preserved there, the three different places in the record I would cite the court to are AR 18, AR 22, and AR 28. First, at AR 18, Mr. Portillo gives very specific evidence that the police were complicit with him directly. That's at 18. At 22, Mr. Portillo makes the argument that, quote, the apparent utilization of local police to try to locate Portillo, along with other factors, clearly established that he suffered past persecution. And then at AR 28, he continued, this is about the cat claim, but was making the same acquiescence argument in government control that's relevant to the cat torture claim as it is to the asylum claim. And he again explains the police inquired about him for working in tandem with the local MS-13 clique. All of that, we think, more than adequately preserves this argument to the BIA. But even if we set that aside, we have our second argument, which alone is dispositive, and that is the BIA addressed the issue of government control. And as virtually every court has held, when the BIA addresses an issue, even if it does so sui fonte, that is sufficient to preserve this court's jurisdiction in order to review that particular question. There was only one issue that the BIA found was vague, and that was there was no argument that Portillo made that he made a report to the police. Now, that issue wasn't advanced to the BIA because that's, in fact, correct. Mr. Portillo has never contested that point. He did not make a report to the police, but that's where the BIA erred in failing to apply the correct legal standard. It seems to have adopted a per se test as a failure to report as alone dispositive of the government control analysis. That's directly contrary to this court's law in the analysis case, where the court said that there's not a mechanical requirement to report if there is evidence that doing so would either be futile or would put the individual at risk. Here, there was very substantial evidence as to both points, but especially as to putting Mr. Portillo at risk. Where did you raise this question of unwillingness and inability to control? I think it's important in a case where we're dealing with a private actor because the thrust of the asylum statute is to prohibit, on a protected ground, persecution by the state. Here, we are dealing with a private actor, and I worry sometimes in these MS-13 cases that we are in danger of making MS-13 a de facto state. That's why the inability or unwillingness to control factor is a very important one. Will you just tell me and read me from the JA where you raised the issue of inability or unwillingness to control? Not before the immigration judge, but before the BIA. Just read that to me where you raised the issue. Your Honor, you would like me to focus just before the BIA and the BIA brief? Okay. Thank you, Your Honor. So, as I said, it's in the Notice of Appeals, Past Persecution. This is contained within, but beyond that, it is addressed in AR-18, AR-22, and AR-28. Those are the different record sites in which, to the BIA specifically, Mr. Portillo makes the argument that because police were collaborating with the gang, that that demonstrated past persecution. Why don't you read me the one that you think is most pertinent, where you actually brought that question before the BIA and satisfied the exhaustion? Thank you, Your Honor. At AR-22, the bottom paragraph of Mr. Portillo's sentence brief, the apparent utilization of local police to try to locate respondents. That is, with other things he's saying in that sentence, together, viewed in the aggregate, clearly established respondents have suffered past persecution. That's at AR-22, where he specifically addresses the collaboration between, in his specific case, of the police and MS-13, leading to past persecution. Now, in addition to AR-18, in the second full paragraph, where he relays the underlying facts in that second paragraph, that, quote, four policemen were working with gang members to come to Respondent's mother's house, threatening Respondent's mother so that Respondent would turn himself into the gang. Respondent's mother saw Elfalone standing behind the police during that encounter, and she understood that Elfalone, or the gang, was linked to the police because they were asking about him. That's, again, one of the essential aspects of the factual accounting that was presented to the BIA, indicating an unwillingness or unableness of the police to report because it would have either been futile or because it would have risked additional danger. And then the last site that I pointed the court to is AR-28. Now, again, this is admittedly when he is discussing the Convention Against Torture Claims, but there is a similar question, to Your Honor's point, about how do we ensure that MS-13 is just not equated with the government or made inadequate. I agree, Your Honor, with the court's concerns that there has to be a demonstration of government control and certainly not a categorical rule that we would advance. Mr. Hughes, can I ask a question related to the second part of your argument with respect to this issue? If, in fact, you had not preserved this issue, and I'm not suggesting that you haven't, what should the BIA have done in its opinion? It seems to me that if, in fact, the issue had not been preserved, there would have been no cause for the BIA to conclude, as it did in the body of the opinion, that that finding by the immigration judge was not clearly erroneous. So it appears that the BIA engaged with the merits of the argument, and as you pointed out, there are a legion of cases where we and perhaps other circuits have held that where an agency, in this case the BIA, actually engages with the merits of the argument that preservation or not, that's enough for us to be able to assess the merits of that conclusion. Yes, Your Honor, that is certainly one of our independent arguments as to why there's no concern about preservation in this case, because irrespective of what the court may think about the notice of appeal and the BIA brief, the BIA squarely addressed the ALJ's conclusion, found it not clearly erroneous, and did not rest on any waiver. The only point, again, as I said, that was squarely identified as waiver, where you would anticipate a waiver if the BIA believed there was one, was to the factual contention that there was no reporting, and that's because that point is uncontested and is not part of our claim here for past prosecution. Mr. Hughes, Judge Keenan, I have a question, sir, about the fact that this is a child victim. How would you factor in a child's age in determining the duty to report issue? So, Your Honor, I think the child's age factors directly to the duty to report issue, because as at least five circuits have held in asylum claims, one must look at this via the lens of what you anticipate as of a child. What would a child be understood to do in these circumstances? And as the court said in Arnelis, if there is a reasonable fear that reporting would lead an individual to be persecuted or reprisal, that is a reason to excuse a reporting requirement. In this context, we are not addressing the context of an adult filing a police report, but rather we must look at this through the lens of a 14- to 16-year-old young teenage child to understand what was both subjectively and objectively reasonable for an individual from that vantage point to undertake. And again, the evidence here was clear. Mr. Portillo testified that a friend of his had reported MS-13 to local police. They had been engaged in a racket where they were taking down his friend's family business for protection money. His friend Omar made a report to police about the circumstance, and he shortly thereafter turned up dead inside a well. That is additional confirmation that an individual in these circumstances would have both a subjective and an objective reasonable concern about approaching police, especially when viewed through the lens of a young teenager. That was the analysis that the agency should have undertaken, but failed to accommodate both what the age of the child means as evidentiary burden and then the substantive standards that should be applicable. Now, I'll note the government does not disagree with us that the age of the child is relevant, and nor could it. DOJ's own guidance recognizes that, quote, the harm a child fears or has suffered may be relatively less than that of an adult and still qualify as persecution. That's the analysis that's been adopted by five other courts, and again, the government eventually takes issue on the face with that. And so the failure to engage there is independent legal error. Mr. Hughes, on the bottom of page 80 of the JA, I think that's the very last three or four lines, the JA talks about the standard it applied with respect to government involvement. Is that an erroneous standard there? The standard was erroneous, Your Honor, because it did not continue to address what this court later said in Ornelas, that an inability or unwillingness can be shown as evidence of either futility or additional risk. I understand that. That's factual. That's the question of whether the standard was fulfilled by the facts. But the question is, that first sentence in the paragraph at the bottom of page 80, is that the correct standard that should have been applied? Whether the government is unwilling or unable to control. Your Honor, that statement is correct, but it's incomplete. It is a correct standard so far as it goes, but this court in Ornelas said that as a matter of law, there are additional ways to show unable or unwilling. Well, clearly there are additional ways, but what I'm getting at is it looks to me that we're not talking about an erroneous standard. We're talking about an interpretation of the facts under that standard. And the immigration judge made findings based on various facts that he recited, and the BIA, as you pointed out, said that was not clearly erroneous. Now, if I'm correct, that this is basically a disagreement with the facts, it seems to me the review standard by our court is one of the most constrained, most deferential in the law. I mean, we basically have to read that as conclusive. I think I've lost people. Anyway, we have to read that as conclusive. That's the word the statute uses, unless held otherwise. And so if you agree that that's the standard, I'm wondering how we can get into that. I mean, there was evidence supporting the IJ's finding, and there was a conclusion by the BIA finding that it was not clearly erroneous. Now, the question isn't whether it was satisfied. The question is whether we were compelled to find otherwise based on those facts. Your Honor, two principal responses to that. The first is there is a legal question that went unaddressed, that is, if it goes to the futility or the risk that it would present, and that is the application of laws of fact, but that requires a legal determination I'll touch on that in a moment. But even if the court disagreed with that point, our second point prior to the application… That statement basically applies to every negligence case. I mean, you're basically saying that the insufficiency or the incorrect application of facts to the standard is a legal question, and I'm suggesting that the court, the IJ, announced the correct factual standard set by statute and then proceeded to make some findings. Your Honor, whether those findings are what we would accept or not, it's clearly some evidence that the man did not go to the police. Now, that doesn't satisfy it necessarily, but certainly that can be considered as part of the standard because it then eliminates one aspect of the evidence that the police were never given an opportunity to respond. But my whole point is it seems to me that you are converting a factual question into a legal one and to get around the statutory deference that we have to show. Yes, and Judge Niemeyer, as I said, really two principal responses that are both prior to application of substantial evidence. The first is the court in Ornelas refined the legal test, so the legal test is not simply unable or unwilling, but includes that as a matter of law, futility and danger to the individual will satisfy those standards, and that's part of the legal analysis that needs to be undertaken. But our second argument is even apart from that, the record here fails to reflect that the court addressed ultimately all of the pertinent evidence that was put before the court, and that's a question that is prior to the application of the substantial evidence. Let me go back to your futility question. It seems to me if the court made the conclusion that and properly can make the conclusion that it would be futile, the court would have to have evidence to support that. And the question in this case is the court clearly didn't think it was futile because there's no evidence to suggest that there was a statement by a petitioner and some others that in the past there had not been a response, but likewise there was countering evidence introduced by the government. So the question of futility is also a question of fact, whether it was futile or not, in the circumstances presented. My whole trouble is that there's a severe danger of us substituting our fact-finding for that of the agency, and in this area of the law there's a real separation of powers issue. We're told to keep our hands off of fact-finding unless we're compelled to rule otherwise. Otherwise, we owe a lot of deference to the agency, and I think the record contains evidence on both sides of this issue. Your Honor, with respect, I think one of the key issues is whether reporting to the police would have triggered a danger to Mr. Portillo, which we know— Well, that evidence you just recited was some evidence on which the immigration judge relies. That is not the legal standard. That is a factual question. Your Honor, I respectfully disagree with that, because I think the court has defined the unable and unwilling analysis to include that if an individual would risk great danger as an objective and reasonable fear of danger for reporting, reporting is not required in that circumstance. And we don't know what the ALJ would have thought about that question if the ALJ addressed the record as it was. Well, it may not be, but the point Judge Niemeyer raises, it seems to me, is a good one, because in these MS-13 cases, we are getting very, very close to sort of taking judicial notice of the fact that MS-13 cannot be controlled, and that, as a general matter, the Salvadorian society and the country is in such a state of disarray that we are almost assuming that MS-13 is beyond control. And I think that's very dangerous for the reasons that Judge Niemeyer points out, and that is that it is drawing us away from the role that the immigration judge and the BIA are supposed to perform. And these are factual questions that relate to particular cases, but I share the concern that where MS-13 is involved, we are making an assumption as a matter of law that MS-13 is the one that's holding the reins in that society, and that they've essentially overcome any efforts on the part of the El Salvador government to bring order, and I don't think we can approach it with that kind of broad brush. I think we have to look particularly at whether the particular persecution in the particular case was something that the government was unwilling or unable to control. Thank you, Your Honor, and let me say, I think I largely agree with virtually everything you just said, because we are not asking for a per se rule in this case that MS-13 is inherently outside government control. Our evidence that we asked the ALJ to address that went unaddressed was in addition to the general country conditions, because, again, mind you, the government rests solely on general country conditions. Let me ask you, on that point, isn't that what we're really talking about if we accept that futility is a question of law, but a question of fact, but the failure to consider it is a question of law? Yes, Your Honor, the failure to consider both futility and the very real danger that this would present to Mr. Portillo, both of those are questions of law. Excuse me, I've been trying to get this in for the last six minutes. If we could go back to Judge Keenan's question a while ago about the age of the petitioner here, how does that figure into all of this most recent analysis that you've been discussing with Judge Niemeyer and Judge Wilkinson? Thank you, Your Honor. Even if we thought we were in substantial evidence territory, which for all the reasons we've discussed, we do not believe that we are, there had to have been a recognition by the agency that this has to be viewed via the lens of an individual who is 13 and 15. And that is a separate legal error because there was never an appreciation by the agency as to how you would view the question of futility and danger to the individual via the appreciation of an individual who is 14 and 15. And again, that… You cited, when you were talking about this earlier with Judge Keenan, you cited other circuits. And have they done it in the context considered age in this context that you're urging us to? Your Honor, I believe the First Circuit in Ordano's keynote has recognized this because it is part of the past persecution analysis, both with respect to what conduct rises to the level that we think is persecution, but additionally to the government acquiescence and the government control. Specifically, I'm not certain if the court has addressed it in the context of futility and dangerousness, but the analysis that those courts apply certainly holds here. Because again, the past persecution analysis, understanding the dangerousness that an individual faced objectively and objectively, is part and parcel of the same question. Would an individual have a reasonable fear of going to authorities in their circumstance? That is basically two sides of the same coin. And so the application of that doctrine that all of the circuits have recognized in terms of whether past persecution or past events rise to the level of persecution would be fully applicable. This raises the point that the whole argument began with is what you raised and what was decided. And you're spending a lot of time now saying that as a matter of law, the immigration judge ruled that futility is not an aspect. But number one, I don't see that in your brief to the BIA, but I also note that the immigration judge addressed it. The immigration judge said the government of El Salvador has put measures into place to address criminal activity and has arrested gang members and corrupt police officers. Now, that to me is a response to futility as a matter of fact, not as a matter of law. I just don't see this being a legal error as you try to make it. We're talking about a disagreement with an immigration judge who was on the scene addressing these gang cases. And as you know, we get a lot of these gang cases. And there has to be some nuanced decision making in deciding whether this is governmental action or whether it is simply criminal activity. And in this case, the IJ concluded that it would not have been futile because El Salvador is addressing the problem, has addressed it, has arrested gang members, and has addressed the police officers. Now, the question is, where is the response otherwise? Well, the response otherwise is the one statement that he thought it would be futile to go because they hadn't responded successfully. But that sounds like a question of fact that was resolved and the BIA accepted it. Your Honor, among the multiple legal errors we're talking about, I think the most clear in response to your question is there was no discussion or appreciation of the evidence that was very specific to Mr. Portillo. The quote your Honor read, if that were sufficient, in the face of specific evidence of futility and danger, would be the sort of quote that an IJ could put as boilerplate in any case arising out of MS-13 in El Salvador. I want to ask you about that because I was intrigued by that too in terms of Judge Dean Meyer's assertion. If that is true, that you can simply say they have, you can make a general statement, they've arrested folks, they've been doing stuff, you would never have this instance then. You could always say it's not futile. Is that your point you're making? Because it seems to me clear there, there's nothing specific to this incident here. I mean in every country there's probably some incident of which when an issue like this is raised, there's something you can point in history, oh they've done something. They did this, they did this, and if an IJ cites that, it seems to me from the perspective of Judge Neimeyer, then we're never futile. So it would seem this would never arise. That's quite right, Your Honor, because the evidence that's cited there says that in a country with more than 4,000 murders, there was a handful of arrests, which does nothing to address the futility or the danger in this case. But our fundamental point is that the error here was not addressing the case-specific evidence about Mr. Portillo. He, from his own personal experience, had multiple incidents that show how there was a relationship between MS-13 and the police in his own individualized experience. But Mr. Hughes, going back to this, I mean nowhere in your brief do you talk about the fear he had because of the episode with his friend. Nowhere. And we've asked you for sites and that just wasn't argued to the BIA. And it seems to me we've got a threshold question of jurisdiction, but even if we don't, you're asking the BIA at least to address an issue that even with the benefit of a brief wasn't put before it. Well, Your Honor, this is also against the backdrop where the government tells us that the court's task here is to review both the BIA and the ALJ decisions. Because the BIA summarily affirmed this is the government's own accounting, and I think they need it because they recognize the BIA decision is so defective. In the BIA's own accounting, what the court has asked here is reviewing both the ALJ's action and the BIA's action together. The ALJ was presented with very clear evidence about Omar who turned up dead at the bottom of a well following his reporting to the police, and that went fully unaddressed by the ALJ. That is part of the decision of the agency that is before this court, and that was a fundamental legal error not to consider all of the evidence that was appropriately put before the agency decision maker in rendering a decision in the case. Thank you, Mr. Hughes. For timekeeping, Mr. Hughes' reserved time was not noted. That's why I assume that he doesn't have any red light to reserve it. So, in fairness to him, I suppose, or in fairness, maybe, we'll give him his six minutes that he reserved because we did stop the argument. But please note that he didn't have his six minutes reserved. Thank you so much. Mr. McLaughlin? You may proceed. Mr. McLaughlin, you're muted, sir. You may proceed, Mr. McLaughlin. My microphone says it is unmuted. Am I unmuted? You are now. Thank you very much. Good morning. May it please the court. My name is Andrew McLaughlin, and I represent the Respondent Attorney General of the United States in this case. I will initially focus, unless the court directs me otherwise, on the argument that formed the basis of the petition for a hearing, but I want to take a step back a little bit further than the court has gone so far in reviewing the context of the arguments in this case. In his testimony to the immigration judge, the questions that Mr. Hughes has raised, the questions that were raised about why Mr. Portillo-Flores did not report, were put to him in his testimony. And in response to those questions, twice, Mr. Hughes simply conceded. He said, I agree. I don't really know. The police might have been able to protect me. Both within the context of the question of his friend who showed up in a well, all we knew there was that the reason that the friend even came up was that the friend had reported a crime against him, extortion against him, and the police had, in fact, been able and willing to act in that case, and at some point later, the friend is dead. That's all we know. Mr. Portillo-Flores was confronted with the fact that he didn't know that the friend was murdered, he didn't know who did it, he didn't know why it was done. None of those things are in this record. None of that evidence was presented. So Mr. Portillo-Flores conceded. He said, yes, the police can protect me. Once again, later on in the argument, he was confronted with this question about the police coming to his mother's house, which, by the way, took place after Mr. Portillo-Flores was already gone, after he had failed to report, so it's frankly irrelevant to begin with. But when confronted with the fact that the police came to his house, Mr. Portillo-Flores again said, look, I don't know. The police might be able to protect me. So that's the context. That was immediately followed by an oral closing argument made by his counsel in which Mr. Portillo-Flores didn't make any of those arguments. He simply said the police were unable to protect me because they came to my house, and that showed that they were involved. I think that you make a fair point and a point that was made in the majority opinion, but I don't see the equivocation of the petitioner here about whether or not he was able to go to police being the grounds for the agency petition. Can you point me to a place where it is? Your Honor, the question of futility or harm from reporting was not raised by Petitioner's Counsel to the immigration judge. And the immigration judge, if you look at that, responded directly to the points that Petitioner's Counsel made. Directly to those points. Futility wasn't raised and harm from reporting wasn't raised to the immigration judge by counsel, so the immigration judge didn't specifically respond to it. I would frame this in the way of affirmative defense. If the defendant in a criminal case doesn't raise their affirmative defense, the judge doesn't address it. And if the evidence in the record doesn't support the affirmative defense, the judge doesn't address it, and both of those are present in this case. It wasn't raised to him, and the evidence specifically said, yes, the police can protect me, therefore the immigration judge didn't address it. Well, Ms. McLaughlin, you know the record better than I do, so I think you'd have to admit that the record is mixed on that. There are the two statements you're talking about, but there are other statements in which the defendant does say that the police wouldn't have protected him. So, you know, I get the point, but I don't know, I think the fact of not resolving that or even relying on it by the agency seems a little odd. No, I would say, given that the argument wasn't made to the immigration judge, nor was the argument made to the board, Mr. Petito-Forez argues that simply having raised the question of past persecution somehow implicitly raises both the unable-unwilling issue and the subordinate question of whether there's an exception to the unable-unwilling requirement for futility, which was mentioned, neither of those things was mentioned to the board. So you can't say that the... Mr. McLaughlin, this is Judge King. Why is it important that the adjaye believed the petitioner and believed his sister in their testimony? Your Honor, Mr. Petito-Forez and his sister both expressed a belief. When questioned about the underlying facts that support that belief, the only factual information that was presented was conceded by Mr. Petito-Forez. He directly conceded the facts upon which his belief was based. He contradicted, he conceded. There was no basis for the immigration judge or the board to address it. Clearly, and the board was waiting for clear evidence. If he finds the guy's credible, which he did, and finds his sister's credible, which he did, and the bulk of his testimony goes against these two admissions, then doesn't he have an... If he's going to say he's credible, doesn't he have to have an opportunity or an obligation really to explain why even so he's credible? No, Your Honor. The immigration judge isn't required to address every conceivable fact that takes place in the record. When Mr. Petito-Forez conceded it and his attorney failed to argue it, there was no reason for the immigration judge to waste precious time in his oral decision, her oral decision, which, by the way, immediately followed that closing argument, in addressing something that counsel hadn't put forward. It just wasn't there. The issue wasn't presented. Counsel, Judge Keenan raised a point earlier about what bearing the fact that a petitioner is a minor or a juvenile would have. I think the thing we're all concerned about is this question of unwillingness and inability to control. Being a juvenile, that wouldn't be related in some way analytically to this basic question of unwillingness or inability to control, would it? I mean, there's no showing that the security forces in El Salvador are somehow less willing to control persecution against children or anything like that, is there? I mean, these are unrelated matters, aren't they? In that sense, I would certainly say they are unrelated, Your Honor. The question of the impact on a child runs throughout asylum litigation. And the board has never held that the impact of the child shouldn't be considered. And, in fact, you can see from the board's decision in this case that it was considered. They first addressed past persecution and agreed that the immigration judge's past persecution finding was correct, that severe harm had not been shown, the kind of severe harm that this court requires and that the board requires for persecution. Then, on the very next page, they go on and say, look, even if you assume that you can establish past persecution using this child mechanism, which we just got done telling you he didn't establish from our point of view, that's now changed because he's no longer a child. Because the presumption that arises from past persecution is dependent on it being the same persecution as existed before. Now that he's no longer a child, the circumstances have changed and he would not get, even if he did get the presumption arising from past persecution, he would not get it now because the persecution that's being alleged has changed. Before, it was based on being a child, and now he can't make that argument about the well-founded fear being based on his being a child. So he was threatened with death. He was 14 years old, and that was never withdrawn or changed. He did not receive the death threat until he was 18, according to his own testimony. His sister testified to it. Yes, Your Honor. His sister received the death threat. And he testified that she did not tell him about those death threats until... But we know when she got it. We know when she got the death threat, correct? Yes. Yes, Your Honor, that's correct. And that would be the controlling point. No, Your Honor. The question of the past persecution is the impact on the child. Mr. Portillo Flores didn't receive that threat, wasn't even aware of that threat, based on his own testimony, until he was 18 years old. How about the actual feeding to the point that he thought he might die when he was 14? Does it have to be a verbal threat? Or was it that he actually received a physical threat of death? On two occasions. He received verbal threats of some sort. He doesn't identify what sort of threats he personally received, and in fact... He said he thought he was going to die. Correct. When he was 14 and beaten up. That's correct. On one occasion, he thought he was going... He doesn't actually say it was a result of the beating. He said at some point during that event he felt he was going to die. So you have... What do you think it would have been the result of? I think when he was approaching the gang, he thought they would hurt him. You can't really tell. The question here is, however, what harm did he receive? Threats themselves are only persecution if harm results. Well, he was physically harmed. Not by the threats. Or at least that's not what's alleged here. There is no evidence from harm from the threats. This makes no sense. Reconciling your position with our cases of Bedoya and our recent case of Aretha Deris. You seem to think there has to be a physical harm inflicted that the death threat is not sufficient. And that's... I mean, if you can see the death threat plus harm, where have you said that there has to be more than a death threat? Your Honor, this is why the government's brief describes why it's so important that this court clarify or correct its precedence regarding death threats. This court is simply wrong in concluding that a death threat in the abstract is past persecution. It's not. It's wrong. Aretha Deris is wrong. What else is wrong? All the way back to Crespin Valadares, which is the first time that this court imported that phrase to say that death threats are categorically past persecution. If you look at where the phrase came from, it came from a phrase in the Refugee Convention and the statute that said life or freedom would be threatened. And in that context, it's not talking about words. It's talking about minutes. The French word that's used in the parallel version of the Convention is minutes. So if I come at you with a knife, I'm menacing you. If I say I'm going to go get a knife and I might hurt you with it, that's a threat, and that's not what they're talking about here. So this court needs to reevaluate where its death threat case law came from and jettison it. So you're admitting that for you to prevail, we need to change our precedent on death threats? No, Your Honor, because the death threat wasn't made to Mr. Portillo Flores while he was a juvenile and while he was in – it wasn't even made while he was in – it wasn't conveyed to him while he was in El Salvador. It wasn't enough, and then they sent him to the United States. That wasn't enough. The sister knew that he was being threatened with death. That's correct. Mr. Portillo Flores, in all of the decision-making that was made in El Salvador, in all of the harm that he endured while he was in El Salvador, was not aware, according to his own testimony, that his sister had been told that somebody would come after him. He wasn't told that. His testimony says, I didn't know that until my sister submitted her affidavit as part of my asylum claim. And her affidavit is dated 2018. So Mr. Portillo Flores wasn't aware – It was credited and believed by the IJ. His testimony that he did not know about the death threat – Her testimony was credited by the IJ, that he was threatened with death when he was – that he was threatened through her with death when he was 14 years old, and as a result, they sent him to the United States. And she testified that she never told him. He was not persecuted because he never knew. Let me understand that point. You are essentially saying that a threat can, in fact, exist, but if he doesn't know about it, and the agency can find a threat actually was there of death, but because he didn't know it, he doesn't get the benefit of it. He did not suffer past persecution in El Salvador, period. I just want to be clear on that point. In other words, because he didn't know it, that in fact, yeah, he is being threatened with death. I mean, we accept that. He just didn't know it. And as a result of that, he doesn't get benefit. But let me ask you something on that point because I think it's important, and I'm trying to parse out what's the difference here in terms of the opinion of the court that seems to be coming out, and that is it seems that – well, it is true that the IJ doesn't have to address every fact, but our law does say that the agency cannot arbitrarily ignore unrebutted facts here. And one of the things I don't think – well, the IJ decision didn't mention at all the testimony of the petition about the four policemen coming to his house, and I didn't mention Omar's death and his sister's testimony, that the people in their neighborhood had a shared understanding that the police were ineffective. And then there's the detailed expert declaration on the Salvadorian police's inability to protect. Is it your position that the agency did not need to address any of this? In this case, Your Honor, it is the position of the United States that the agency did not need to address those facts. The agency didn't need to address those facts. But Your Honor, you accept that the sister did make a declaration stating that the gang had directly threatened him with death. And from your point of view, that doesn't matter here, because he didn't know it? He was not persecuted in El Salvador on that basis. And with respect to past persecution, it is not relevant. However, it is relevant to whether or not he should fear – whether he would have a well-founded fear of future persecution. Regarding Judge Thacker's question, she sort of went there. Apart from the threats, are you saying that the beatings alone would not be persecution? That is correct, Your Honor. That was the conclusion of the board, that the evidence that was presented that contained no evidence about the severity of the beatings other than the fact that there were bruises from the last of those beatings, no evidence at all about the severity of the other beatings, but with respect to the last of the beatings, there were bruises such that the mother noticed them, and he felt he would die. That's it. That's all the evidence that there was. This court has had numerous cases where the severity of beatings was far greater than that, the evidence of the severity was far greater than that, and haven't reached any conclusion on that basis. Counselors, Judge Harris, it looks to me as though the IJ and the BIA didn't say what you just said. They just said he didn't receive medical care, period. And I think the IJ goes on to say, and based on that, it didn't rise to the level of persecution. It could not be clear that that's the only factor. So is there a case that says somewhere that if you don't receive medical attention, that's all we have to look at? No, Your Honor. Okay, well then, didn't the agency apply the wrong legal standard? No, Your Honor. The question here is- Why not? That's all the agency looked at. That's literally all the agency looked at, so why, as you just said, that's not the standard, so- The question here is did the harm rise to the level of persecution? And the question here is- No, I guess I'm asking a different question. I'm asking a different question. Did the agency apply the right legal standard in considering that question? The question of the legal standard regarding whether or not medical care is required wasn't what the agency addressed. The agency addressed whether or not the harm rose to the level of persecution. I'm just going to try. I will only try one more time, and then I will let this go. The agency said it did not rise to the level of persecution, and the one reason that that is so is because he did not receive medical attention. I am asking you, was that the right legal standard? That was not the standard that the agency applied. It is not the right legal standard. But the I.J. said he didn't receive medical care, and based on that- Which is, by the way, correct. The level of harm- Among the many- You should say anything. That shows that Mr. Portillo, of course, did not establish. The I.J. said the injuries did not require medical attention, and based on that, the court finds that the level of harm that he experienced did not rise to the level of persecution. Was that correct? If your conclusion is that was the sole basis for the immigration judge's decision- How else am I supposed to read that? The I.J. said, based on that. Why are we doing this? Your Honor, the question is whether Mr. Portillo Flores established severe harm. There is nothing in that that establishes severe harm. The question is what else would have established severe harm. The fact that he didn't receive, didn't seek medical care establishes. The fact that he characterizes it only as bruises characterizes. The fact that he could leave within a week to go to a different location in the country also establishes that this harm wasn't severe. There's numerous parts of the record that show you that Mr. Portillo Flores did not establish severe harm. The fact that the immigration judge points to, and frankly, mischaracterizes what was said, characterizes it as didn't need it as opposed to didn't seek it, that doesn't mean that Mr. Portillo Flores met the legal standard which was to establish that the harm that he experienced was severe. There is zero evidence of severe harm in this record. Not a single bit. So being beaten to the point that he thought he was going to die is not severe. Is that the government's position? What an individual thinks is subject to being tested on examination. He was found credible. Yes. He did think it. That doesn't mean it's true. So it was tested on cross-examination. It was tested by the immigration judge. Even for a 14-year-old? Well, at the time he was testifying, he was 18, but yes. I don't see how that matters. The short answer is there has to be evidence. There has to be evidence of something. What is the evidence of severity? There was no evidence of severity. Did the BIA go through all of what you're saying or did the BIA only address what Judge Harris read? The BIA didn't say any of that. The BIA said the immigration judge did not clearly err. They may have actually said something about that. He said they, but the BIA decision here was only a single judge, not a panel. So how does that impact our review? The fact that it was a single member is still a decision of the agency. It combined with the immigration judge's decision that they found was not clearly erroneous. Now, allow me to point out this question. The single judge doesn't get as much weight as the panel. They both receive deference. They are both the agency. There's not as much deference. The single judge doesn't get as much deference. And the board is going to get Chevron deference. It's different. This is a single judge that was amending, trying to clean up the IJ for you. And he doesn't get as much deference as if he had the board with him. That's correct. Let me point out, I misspoke earlier. The board specifically did say that medical care was not required as opposed to not receiving medical care. So the board examined what the immigration judge concluded that he did not err in determining that the harm, that it hadn't been demonstrated to be sufficiently severe based on not requiring medical attention. I wanted to ask a question, a follow-up from Judge Harris, because I was trying to follow that logic. And she gave the reason that the IJ actually gave. And then you responded by giving various reasons why the harm wasn't severe enough. But the agency didn't actually provide it. I mean, it seems we'll limit to what it actually gave, which is what Judge Harris dealt with. And then you responded saying, well, it wasn't severe enough. But that's not what the agency provided as a reason. Let me take a moment to ask you to look at Elias Zacharias and Bowman Transportation. In Bowman Transportation, the Supreme Court specifically noted that the agency didn't discuss certain evidence. And they said that's not wrong. I don't want to get into a discussion. I'm dealing with the facts of this case. And whether there are cases that would allow them to deal with it, we can wrestle with that. But I want to be clear, that's your point. And your point is that even though the IJ actually gave what Judge Harris read, there are other various reasons of harm to indicate why it wasn't severe, but the agency didn't actually provide it. And your point is that based upon that, we should uphold the agency. And I don't quite follow that. Your Honor, Now, I understand that you're saying that there are cases that may say you can do it. I guess that's what you're saying. But we can figure that out. But I want to be clear. That is your point here. No, Your Honor. My point is, the immigration judge's actual finding, and the board's actual finding is, there is no evidence that this harm was sufficiently severe to amount to fast prosecution. The immigration judge gave a specific Excuse me, Mr. McLaughlin. It seems to me that you're trying to argue around the point that Judge Harris was making, and you're really not helping us decide this case if you continue to do so. The IJ said, however, these injuries did not require any medical attention. And based on that, the court found the level of harm that the respondent experienced did not rise to the level of prosecution. The IJ narrowed the inquiry and based it on the absence of seeking medical care. And now you're searching through the record and asking us to be diverted from the fact that there's plain legal error here. How do you address the fact that there is plain legal error in the IJ's analysis? Honestly, I think the IJ misspoke. Just a second. Let me just raise, refine that question, because I think the question blurs the fact that when someone doesn't seek medical care, may not describe the severity of the injuries. But when the board, the IJ said it was an injury that did not require medical care, that does go to the severity. So that regardless, somebody who didn't require medical care could have still have sought it, and it still wouldn't make it severe. And vice versa, if it was not severe at all, the conclusion that it did not require, the level of the injury didn't require medical care is different from whether he sought it. In this case, the IJ addressed the level of the injury, which I think is directly supported by the evidence that only bruises were manifest when observed by the mother. The question is whether you can discern what the immigration judge was attempting to say and what the agency was attempting to do. That's what the case law says. My point on this is not whether the person sought medical care. The point is whether the injury necessitated medical care. And it's the latter that the IJ addressed. So, counsel, taking Judge Niemeyer's help for you, if it's your position then, the position of the United States, that if someone does not seek medical care, that is a reason for denying them a benefit? That is evidence that the severity of the harm is not great. I frankly think that laymen may often not know whether they need medical care or not. I've been with people that have had a stroke and did not think they needed medical care. So, I'm not sure that I follow that. So, maybe you explain that for me. Looking at what the agency said, its reason was to deny relief. Your Honor, when harm is severe enough to amount to past persecution, you'll know. You know that the harm is severe. You know that you need medical care. You know that you should get medical care. That's not real world. I've literally been within the last two years with someone who had a stroke. You need medical care. And that person wasn't beaten, Your Honor. Well, this is a little gloss you're putting on, which you said to me to begin with. If you need medical care, you will go get medical care. You will know you need medical care. That's what I'm saying to you. And again, you're talking about a 14-year-old. Correct. With quite a medical degree. Why don't you address, instead of whether somebody seeks medical care, that would be an erroneous standard. But in this case, the I.J. assessed the injury. In other words, taking Judge Motz's situation, if the person had a stroke, that injury required medical care, whether they knew it or not. In this case, the I.J. assessed the injury and said the injury didn't require medical care, not whether he sought it or not, which is irrelevant. I think you're absolutely correct. Tell us in assessing the injury, what was the evidence that he assessed the injury? Because all I see is the testimony of the petitioner saying he didn't receive medical care. And based upon him saying that, they said it's not required. I don't know of any evidence in this record that says they assessed an injury. Your Honor, the burden is on the applicant. I understand that, but I'm simply going to the question as posed by Judge Niemeyer, that they assessed the injury. And I'm saying the only testimony I see is the petitioner saying he did not receive medical care. And based upon that, they then took it to the next step and said it was not required. But there's nothing underlying that that says anything about assessing an injury. And to the point that's being made is that one can be in a position where, yes, you need medical care, but you didn't receive it. Or you may well have required it and you didn't receive it. But the only thing you have here is the testimony of the petitioner that says he did not receive medical care. Now, had the IG made that statement, perhaps we would be going back and forth on it. It took it another step and says it was not required. That's not supported, and I'd like to know if it is. Where is that evidence that indicates it was not required beyond the testimony, the naked testimony, he didn't receive it? Was there any other evidence? Judge Ray, may I respond? I'm past my time. Was there any other evidence, yes or no? Your Honor, there wasn't any evidence specifically mentioned by the immigration judge. However, that and everything else isn't evidence of the severity. There is no evidence of the severity. I'm not talking about evidence mentioned by the immigration judge. I'm talking about was there any other evidence in the record beyond the petitioner stating I did not receive evidence of the treatment? Was there anything else that would support saying it was not required? That's a yes or no answer. Yes. The fact that the mother identified, looked at his bruises and sent him somewhere else in the country just a few days later, the fact, all of those things, the fact that he came home after the meeting, all of those things tell you that there's no evidence of severity, zero evidence about severity, and on that basis, Mr. Portillo-Flores failed to establish past persecution. He failed, and that's what the immigration judge held. Thank you, Mr. McLaughlin. Thank you. Mr. Hughes, you have some time reserved. Thank you, Your Honor. I'd just like to begin with one general point and then briefly touch on three points, if I may. The general point is that the government's argument rests entirely on asking the court to draw conclusions that were never reached by the agency, and that brings us to the fundamental point of the petition, that when the agency applies the wrong legal standards, does not reach conclusions that adequately support the result that it reaches, and does not fairly address the record, if any of those three things occur, the court just does not get to substantial evidence, and that is a necessary basis in order to vacate. The three specific points I'd like to make are, first, touching on the standards. Mr. Hughes, can I ask a question with respect to that? So if that's right, is it, and I notice at the end of your supplemental brief, you said at a minimum this case should be vacated and remanded back to the agency for further proceedings. So what do you mean by that, at a minimum? Are you suggesting that the record in this case compels but one conclusion with respect to the issues that we've been talking about this morning? Yes, Your Honor, that's our alternative. At minimum, the legal errors require a vacater, but I think the court could proceed to find that Elias Zacharias' standard is satisfied, that the only reasonable conclusion a fact finder could meet in these circumstances is that there was past persecution in reverse. So the three legal things I said earlier, that's the distinction between, of course, vacater and reversal. If the court were to rely on just those bases, vacater would be more appropriate. So, Mr. Hughes, did I just hear you say, maybe I misunderstood. Are you saying on the inability to, inability and unwillingness to control, the record only supports one conclusion, and that the government was unable or unwilling to control? Are you saying on that issue, the record only supports one conclusion? Yes, Your Honor, that is our position. Now, if the court agrees with us, that would be a basis to reverse. If the court disagrees and thinks that reasonable minds should come to a different place, then that would be a position where the court should vacate. And I think that would be the touchstone in the resolution of the case if the court is disposed towards petitioner on that issue. Two specific points I'd like to raise on past persecution. First, I think if the court appreciates, the agency applied the long standard of awaiting medical care as a necessary requirement. Further, on the death death, the government makes it clear that they seek to overturn dozens of reports. Mr. Hughes, I asked your colleague the same question, and you fall into the same pitfall. The question isn't whether somebody sought medical care. The question is whether there was an assessment of injuries based on the conclusion that medical care was not needed for that injury, regardless of whether they sought it. Your Honor, that was my point. Just a minute, just a minute. And in this case, the record shows, with respect to the last beating, that there was bruising, which was observed by the mother, and nothing further. Indeed, there was evidence that he carried on otherwise, with respect to what he was doing in life, without the need, not whether he sought it, without the need for medical attention. And so at least the fact finder could reach that conclusion. Now, if you say that's too thin, it seems to me it's still the burden of the petition to show it, or at least you'd have to give the IJ the opportunity to explain further if you wanted that. Your Honor, two things. I don't think the fact finder could conclude that based on the threats and the death threats that we can touch on, but even if a fact finder could, the fact finder simply did not find that here. The fact finder rested on a legally erroneous understanding of what persecution is. So that, at a minimum, requires a vapid term. But I think reversal is found in the full mosaic of circumstances here. The beatings where he almost died, the repeated threats, the death threats that are made to his sister and his mother, because threats to the family directly bear on the objective and subjective prongs of the persecution analysis. So does this put us back at the question, even if we've sat with Judge Niemeyer's point on this, that effectively what we're saying is that the agency made up a new legal standard under which the physical harms can be said to qualify as persecution only if they're severe enough to require medical attention. Where does that exist anyway? It does not. The Third Circuit in its Doe and Blanco decisions looked at identical language that the BIA and ALJ used and found that it was a made-up mechanical standard that had no basis in asylum law and rejected it as a legal error. So, Mr. Hughes, I think Judge Wynn makes a good point that if there was a standard, a legal standard required that required medical attention, that might be a legal standard. But it seems to me there's a difference in pointing to a fact that the injuries did not need medical attention that supports the legal conclusion that there was not past persecution and saying that because they pointed to the fact, they therefore established the standard. Well, I think the language here, it was based on. The ALJ said quite squarely that there was no medical attention that was received or required and based on that fact alone led to its conclusion that there was no past persecution. I think that squarely adopts the standard. And there was certainly no discussion of any of the other relevant... Mr. Hughes, if I could follow up a little bit on that. There's no testimony in this record from a medical professional, a doctor or a nurse, as to whether a medical attention was required. So, could you tell me in the absence of any evidence from a medical professional as to whether medical attention was required? How can we conclude that this is a correct standard, a conclusion that no medical attention was required when there was no medical testimony? I think that's right, Your Honor. And as the Third Circuit has said, there is no such mechanical or checklist formula to assess in one circumstance the lives of persecution. Here, where an individual, a 14-year-old boy, was beaten to the point where he testified, credibly found that he almost died, and we know that there were death threats that were directed to him. To my friend's point, he warned of those death threats later. That's irrelevant to the analysis of whether he was at objective risk. And further, as my friend, I believe, appreciates, all that we're trying to assess here is the future risk that Mr. Porcillo faces if he is returned to El Salvador. And those death threats, having never been retracted, certainly bear on that, both on past persecution and future persecution. And they were discounted by the agency for the sole reason that they were uttered to his sister rather than him directly. His sister, Diaz de Gomez, in a footnote, rejected that directness requirement. The full nature of events here, I think, can tell the conclusion that there was a persecution at the very least. Mr. Hughes, if I may, your colleague on the other side, with respect to this issue of death threats and our cases that address this question, seem to suggest that we have sort of an ironclad, black-foot rule that in the abstract, with nothing absent, anything more than a death threat standing alone, is sufficient to make a finding of past persecution. I don't understand that to be your position, right? I mean, you've got death threats plus a lot more here, at least that's your point. But do you read our cases the same way? No, Your Honor. This court's case is, I point the court to Cedillo's Cedillo 2020 decision, which says it's quote-unquote credible death threats, and then more recently this year in Diaz de Gomez, the court said that unspecific or distant death threats would not qualify. The whole question here is whether those are credible, and that follows directly from the Supreme Court's decision in INS v. Stevick, where the court said that the meaning of persecution is broader than a threat to life. If you have a credible death threat, that is per se a threat to life. The Supreme Court's own definition and understanding of persecution would fall within. Mr. McLaughlin says that those death threats have to be conveyed to the child. Death threats were made when he was 14 years old to his sister, and Mr. McLaughlin says that can't count, because he's a 14-year-old child and he didn't know it. Now, is that a correct proposition that Mr. McLaughlin's marketing here? No, Your Honor. The court, Diaz de Gomez, squarely rejected that, and for good reason. I think we can appreciate why a family might not tell a 14-year-old young teenager that MS-13, a notoriously murderous gang in El Salvador, has issued death threats against him. A family's decision not to share that information with the child, I think, is reasonable, and in no way undercuts both the objective risk that he faced, as well, again, the past persecution is all done as proxy for what the future danger the individual would suffer if returned to El Salvador. And a death threat, unretracted, that he is now aware of, certainly has all the indicia that suggest that he has a well-founded fear, both subjectively and objectively so, of persecution if returned to El Salvador, and absolutely establishes that standard. So, that he found out about it later, and his family protected him in his time as a young teenager has no bearing on this analysis. All right, Mr. Hughes, thank you so much. Mr. McLaughlin, as well. We can't come down and shake your hand, but please know that we very much appreciate your argument here today. And be safe and stay well. Thank you so much. The court will take a brief break before hearing the next case.
judges: Gregory, Wilkinson, Niemeyer, Motz, King, Agee, Keenan, Wynn, Diaz, Floyd, Thacker, Harris, Richardson, Quattlebaum, Rushing